UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WHYZ RADIO, L.P.
c/o 5207 Washington Boulevard
Tampa, Florida 33619

    and

DR. GLENN W. CHERRY
5207 Washington Boulevard
Tampa, Florida 33619

    and

CHARLES W. CHERRY, II, ESQ.
5207 Washington Boulevard
Tampa, Florida 33619,

    and

GROUP ASSETS, LLC
5207 Washington Boulevard
Tampa, Florida 33619,

      Plaintiffs,

    vs.

D.B. ZWIRN SPECIAL
OPPORTUNITIES FUND, L.P.
745 Fifth Avenue, 18th Floor
New York, NY 10151

    and

BLACK ENTERPRISE/
GREENWICH STREET CORPORATE
GROWTH INVESTORS, LLC
399 Park Avenue, 7th Floor,
New York, NY 10043

    and

BLACK ENTERPRISE/
GREENWICH STREET CORPORATE

Case No. 8:09 cv 0033-T33
EAJ

Judge _____

COMPLAINT WITH
CLASS ALLEGATIONS AND
DEMAND FOR JURY TRIAL

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA
09 JAN -9 PM 3:56
FILED

TD4 8849
$3 50

GROWTH MANAGEMENT, LLC              :
399 Park Avenue, 7th Floor,         :
New York, NY 10043                  :
                and                 :
                                    :
                                    :
BLACK ENTERPRISE/                   :
GREENWICH STREET CORPORATE          :
GROWTH PARTNERS, L.P.               :
399 Park Avenue, 7th Floor,         :
New York, NY 10043                  :
                                    :
                and                 :
                                    :
STRAIGHT WAY RADIO, LLC             :
c/o D. B. Zwirn, L.P.,              :
745 Fifth Avenue, 18th Floor        :
New York, NY 10151                  :
                                    :
                and                 :
                                    :
BERNARD RADIO, LLC                  :
c/o D. B. Zwirn, L.P.,              :
745 Fifth Avenue, 18th Floor        :
New York, NY 10151                  :
                                    :
                and                 :
                                    :
CHRIS MCMURRAY, President,          :
STRAIGHT WAY RADIO, LLC and         :
BERNARD RADIO                       :
7148 Elm Creek Lane                 :
Dallas, TX 75252                    :
                                    :
                and                 :
                                    :
JEFFERY SCOTT                       :
c/o Black Enterprise/Greenwich Street, :
399 Park Avenue, 7th Floor,         :
New York, NY 10043                  :
                                    :
and                          :      :
                                    :
ED A. WILLIAMS                      :
c/o Black Enterprise/Greenwich Street, :
399 Park Avenue, 7th Floor,         :
New York, NY 10043                  :
                Defendants.         :

09 JAN -9  PM 4: 07
CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA
FILED

Plaintiffs, by their attorneys, bring this civil action for damages on behalf of themselves and all others similarly situated against the above-named defendants, and, demanding trial by jury, complain and allege as follows:

## I. JURISDICTION AND VENUE

1. This complaint is filed to recover damages under state and federal law and the costs of suit, including reasonable attorneys' fees, for the injuries to Plaintiffs and a class of all others similarly situated, as a result of defendants D.B. Zwirn, Straight Way Radio, Bernard Radio and McMurray's violation of these laws. Relief other than class relief is also sought against the remaining defendants (the three Black Enterprise/Greenwich Street funds, Scott, and Williams).

2. The Court has jurisdiction over this dispute under the provision of 28 U.S.C. §1332 inasmuch as the citizenship of all Plaintiffs is diverse from that of all defendants. The Court also has jurisdiction under the provisions of 28 U.S.C. § 1331, for the reason the claims set forth herein arise, in part, under the provisions of 47 U.S.C. §310(d), the Federal Communications Act and the Equal Credit Opportunity Act (ECOA) 15 U.S.C. §1691, et seq. implemented by 12 CFR Part 202, which proscribes racial discrimination in lending where evidenced by disparate treatment or impact.

3. Venue is proper in this district under 28 U.S.C. §1391 (a) for the reason a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## II. PARTIES

4. Plaintiff WHYZ is a South Carolina limited partnership whose management operations are performed in part in this district. WHYZ is authorized to do business in

the State of Florida.  Plaintiffs Glenn and Charles Cherry are Florida citizens and equity holders in WHYZ.  Plaintiff Group Assets, LLC is a Florida limited liability company that owns real estate in Florida and operates radio broadcasting studio and tower sites.

5.  Defendant D.B. Zwirn Special Opportunities Fund, L.P. (hereinafter "DBZ") is an entity organized and existing under the laws of the State of Delaware.  Defendants Black Enterprise Greenwich Street Corporate Growth Investors, LLC is a Delaware limited liability company (hereinafter "BE/GS Investor").  Defendant Black Enterprise/Greenwich Street Corporate Growth Partners, L.P. is a Delaware limited liability partnership (hereinafter "BE/GS Partners").  Defendant Black Enterprise/Greenwich Street Corporate Growth Management, LLC is a Delaware limited liability company (hereinafter "BE/GS Management"). Defendant Straight Way Radio, LLC is a Delaware limited liability company (hereinafter "Straight Way") and a wholly owned subsidiary of DBZ.  Defendant Bernard Radio, LLC is a Delaware limited liability company (hereinafter "Bernard") and a wholly owned subsidiary of DBZ.  Defendant McMurray is a citizen of Texas and president of Straight Way and Bernard.

6.  The events complained of herein arise out of conduct which has caused and threatens to cause tortious injury in the state of Florida by Defendants, parties that regularly do and solicit business in Florida, engage in a persistent course of conduct in Florida, derive substantial revenue from services rendered in Florida, and claim an interest in real property located in and the State of Florida.  Defendants actions also violate Florida law, specifically, §448.101(1)(3), Fla. Stat. (1997), the Florida Whistleblowers' Statute.

7. The acts in this complaint, alleged herein to have been done by each defendant, were, upon information and belief, authorized, ordered or done by officers, agents, employees, or representatives of each while actively engaged in the management, direction, control or transaction of its business affairs.

### III.  Co-Conspirators

8. Various other corporations, organizations, firms and individuals, not made defendants in this complaint, participated as co-conspirators in the violations alleged herein, and performed acts and made statements in furtherance thereof.

### IV.  Class Action Allegations Against DBZ, Straight Way and Bernard

9. Plaintiff WHYZ brings this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and a class ("Class") and subclass ("Subclass").

a. Plaintiff WHYZ brings this action for damages under Federal Rule of Civil Procedure 23(b)(1) on behalf of a class defined as:

> All persons and business entities located in the United States who at anytime obtained financing from DBZ or its predecessor Highbridge/Zwirn Special Opportunities Fund who at the time of obtaining financing were insolvent or in a financial condition that made it clear they did not have the ability to repay the loan, but nonetheless were charged interest in excess of 38%, a balloon payment, negative amortization, prepayment fees, both cash interest and advance interest and fees were financed as a part of the loan payment, and the loan was made on the basis of an asset appraisal only with no consideration of the borrower's ability to repay or customary due diligence.

b. Plaintiff WHYZ brings this action for damages under Federal Rule of Civil Procedure 23(b)(2) on behalf of a class defined as:

> All persons and business entities located in the United States who at anytime obtained financing from DBZ or its predecessor Highbridge/Zwirn Special Opportunities Fund who at the time of obtaining financing were insolvent or in a financial condition that made it clear they did not have the ability to repay the loan, but nonetheless were

charged interest in excess of 38%, a balloon payment, negative amortization, prepayment fees, both cash interest and advance interest and fees were financed as a part of the loan payment, and the loan was made on the basis of an asset appraisal only with no consideration of the borrower's ability to repay or customary due diligence.

c. Plaintiff WHYZ brings this action for damages under Federal Rule of Civil Procedure 23(b)(3) on behalf of a class defined as:

All persons and business entities located in California, Florida, Ohio and Virginia who at anytime obtained financing from DBZ or its predecessor Highbridge/Zwirn Special Opportunities Fund who at the time of obtaining financing were insolvent or in a financial condition that made it clear they did not have the ability to repay the loan, but nonetheless were charged interest in excess of 38%, a balloon payment, negative amortization, prepayment fees, both cash interest and advance interest and fees were financed as a part of the loan payment, and the loan was made on the basis of an asset appraisal only with no consideration of the borrower's ability to repay or customary due diligence.

10. Plaintiff WHYZ does not presently possess information identifying the exact size of the Class or Subclass. Based upon the nature of the lending involved, WHYZ believes that the total number of Class and Subclass Members is sufficiently numerous so that joinder of all Class and Subclass members is impracticable.

11. The claims of WHYZ are typical of the claims of the Class and Subclass. WHYZ will fairly and adequately protect the interests of the Class and Subclass. WHYZ has no conflicts with any other Class or Subclass Member, and have retained competent counsel experienced in class action litigation.

12. Common questions of law and fact exist, including:

a. Whether DBZ combined or conspired with others to prey on distressed borrowers and through the use of both oppressive and inequitable lending and collection tactics obtain the borrowers' assets for less than fair value;

b. Whether DBZ violated Federal Communications laws;

6

    c.  Whether DBZ violated state consumer lending laws; and

    d.  Whether DBZ violated the Florida whistleblowers' statute.

These and other questions of law and fact are common to the Class and the Subclass and predominate over any questions affecting only individual Class and Subclass Members.

    13. Class action treatment is a superior method for the fair efficient adjudication of the controversy described herein. A class action provides an efficient method whereby enforcement of the rights of WHYZ, the Class and Subclass Members, and defendants can be fairly managed. WHYZ knows of no unusual problems of management and notice. If necessary or appropriate at a later time, the Class can be divided into further subclasses.

## V. FACTS COMMON TO ALL COUNTS

    14. Plaintiff WHYZ is a surety for certain debt allegedly owed by Tama Broadcasting, Inc. (TBI), a Delaware corporation, to its senior creditor DBZ. Specifically, by reason of the financial relationship between WHYZ and TBI, under certain circumstances, WHYZ may be liable to DBZ for a portion of TBI's debt. In the event that TBI pays its obligations to DBZ in full, WHYZ has no obligation to DBZ. Accordingly, as a surety WHYZ is entitled to assert herein all claims and defenses available to TBI against DBZ. The claims set forth below are being asserted by WHYZ in its capacity as a TBI surety.

    15. TBI entered into an agreement in 2001 with BE/GS Partners and BE/GS Investors to obtain equity financing to expand and enhance its radio broadcasting business. By reason of their size copies of the agreements are not attached but readily available to the parties. Under the terms of the agreements with BE/GS, under certain circumstances,

provided that consent was received from the Federal Communications Commission (FCC), control over TBI's nine radio licenses and over TBI corporate governance would transfer to BE/GS.[1]

16. In 2004 TBI obtained debt financing from DBZ.  BE/GS despite having previously invested in TBI and having acquired rights to assert control over TBI under certain circumstances, acquiesced in the infusion of DBZ's debt.  The nine radio licenses and all physical assets of the stations were pledged as collateral for the DBZ loan.  Due to its size a copy of the DBZ financing agreement is not attached, but is readily available to the parties.

17. Plaintiffs, Dr. Glenn Cherry and Attorney Charles Cherry possessed voting and operational control over TBI, unless BE/GS elected to exercise its right, subject to FCC approval, to assume control of TBI.

18. BE/GS purportedly exercised its right to assume control of TBI on July 18, 2006, however, Plaintiff Glenn Cherry remained Chief Executive Officer of TBI until May 29, 2008, and both Plaintiffs Glenn and Charles Cherry at all times relevant herein have been directors of TBI.

19. DBZ alleged that TBI had defaulted on certain loan payments owed under the financing agreement between DBZ and TBI.

20. In order to obtain the forbearance of DBZ, DBZ instructed TBI to enter into a restructuring agreement and a time brokerage agreement, under which DBZ subsidiary Bernard Radio, LLC, would assume day-to-day control of TBI's radio station operations.

---

[1] TBI or one of its subsidiaries owns the following nine radio stations:  WTMP-AM 1150 Egypt Lake, FL; WTMP-FM  96.1  Dale City, FL; WJSJ-FM  105.3  Fernandina Beach, FL; WSJF-FM  105.5  St. Augustine Beach, FL; WHJK-FM 105.7 Baldwin, FL; WFJO-FM 92.5 Folkston, GA; WSSJ-FM  100.1 Rincon, GA; WSGA-FM 92.3  Hinesville, GA; WTHG-FM  104.7  Hinesville, GA;

21. Time brokerage agreements while not unlawful per se, must require the licensee of a radio station to maintain ultimate control over the personnel, finances and programming of the radio stations that are party to the agreement. Here, Bernard Radio was permitted by TBI to control day to day operations of the nine radio stations, however TBI was required by §310(d) of the Federal Communications Act to maintain ultimate control over personnel, finances and programming, lest TBI potentially forfeit the licenses.

22. DBZ has continuously since the third quarter of 2007 attempted to obtain, assert and exercise, and continues to exercise control over the TBI radio licenses, in violation of federal law, namely §310(d) of the Federal Communications Act.

23. In violation of their fiduciary duties and the relationship of special trust that exists between TBI and BE/GS, Defendants BE/GS, Scott and Williams have aided and abetted DBZ's premature assumption of control over TBI.

24. In response to DBZ's premature assumption of control over TBI, Plaintiff Glenn Cherry filed a complaint with the FCC Enforcement Division. The Complaint has been designated EB-08-IH-0692 by the FCC Enforcement Division and Plaintiff Glenn Cherry's response to the FCC investigation (less exhibits) is attached as Exhibit 1A. An active investigation concerning DBZ's premature assumption of control as a collection method and of its predatory lending behavior is currently ongoing at the FCC.

25. In retaliation against Plaintiff Glenn Cherry for attempting to adhere to his responsibility as CEO of TBI to maintain ultimate control over the stations' personnel, finances and programming, Defendants BE/GS, Scott and Williams, conspired with

9

Defendants DBZ, Straight Way, Bernard and McMurray to remove Plaintiff, Glenn Cherry, as TBI CEO.

26. Defendants Scott, Williams and BE/GS have caused BE/GS to violate the relationship of special trust and duties of good faith, loyalty, fidelity and care between TBI and BE/GS.

27. Defendants DBZ, Straight Way, Bernard and McMurray have caused DBZ to violate the relationship of special trust and duties good faith, loyalty, fidelity and care between TBI and DBZ.

28. Under Section 9-607 of the New York Uniform Commercial Code, and in its capacity as secured party under the Security Agreement with TBI, DBZ has alleged that it has a right to collection upon two pledged promissory notes and additional pledged indebtedness by WHYZ to TBI and Tampa Broadcasting, a TBI subsidiary.

29. DBZ, as agent and sole lender, and TBI, as borrower, and Tampa Broadcasting and other TBI subsidiaries and affiliates, as guarantors, executed the Financing Agreement, pursuant to which DBZ made an original term loan to TBI in the aggregate principal amount of $21 million and an additional term loan to TBI in the aggregate principal amount of $1.5 million.  In connection with this financing, TBI and Tampa Broadcasting executed and delivered to DBZ a Security Agreement in order to secure payment and performance of all of TBI's and Tampa Broadcasting's obligations to DBZ. By reason of its size a copy of the Security Agreement is not attached but readily available to the parties.

30. Under the Security Agreement, TBI and Tampa Broadcasting granted a security interest in, inter alia, all "instruments" (as such term is defined in the Uniform

Commercial Code). TBI and Tampa Broadcasting delivered physical possession to DBZ, in perfection of such security interest, of the following two instruments:

    (a)    Promissory Note dated March 31, 2003, executed by WHYZ, as maker, in favor of TBI, as payee, in the original principal amount of $45,000, bearing interest at zero percent per annum (the "2003 Note," a copy of which is attached hereto as Exhibit 1); and

    (b)    Promissory Note dated September 30, 2001, executed by WHYZ, as maker, in favor of Tampa Broadcasting, as payee, in the original principal amount of $376,289, bearing interest at the rate of 5.75% per annum,. compounded annually (the "2001 Note," a copy of which is attached hereto as Exhibit 2).

31. DBZ may be entitled to resort to its remedies under the Security Agreement to collect in place of TBI, amounts due from WHYZ under the 2003 Note and the 2001 Note and to apply such amounts to reduce the balance due by TBI and Tampa Broadcasting under the Financing Agreement. In the event that TBI pays to DBZ all amounts owed under the Financing Agreement however, DBZ is not entitled to collect any amount owed by WHYZ to TBI. In this regard a suretyship arrangement exists between WHYZ, TBI and DBZ. Accordingly, WHYZ may defend an action by DBZ against TBI and may set up any claims, legal or equitable defense which TBI may have against DBZ.

32. The claims asserted herein below on behalf of WHYZ are claims available to TBI and its subsidiaries against DBZ.

33. In order to attain an unfair advantage over TBI, DBZ has attempted to sell TBI's collateral in a manner inconsistent with the requirements of Article 9 of the Uniform Commercial Code.

34. DBZ's actions in this connection have been stayed, however notwithstanding the stay, DBZ is capable of repeating its unlawful attempt to sell collateral without this attempt being subject to judicial review. Since DBZ's acts are capable of repetition but evading review this dispute presents a justiciable controversy.

35. WHYZ, and others similarly situated are entities owned by entrepreneurs that by reason of scale, race or other factors encountered difficulty in obtained financing.

36. DBZ or its predecessor Highbridge/Zwirn embarked upon a specific campaign to market loans to entities situated as TBI. Among other things, DBZ sent representatives and brokers to industry conferences to advertise the availability of financing to small and minority owned companies, despite credit history or financial condition. DBZ specifically targeted industries where prospective borrowers possessed assets that were capable of being liquidated in fewer than 90 days.

37. Once DBZ undertook to provide financing it did so in an atmosphere where it had far superior bargaining power to its borrowers by reason of the enormous collection of unregulated capital that its Fund constituted, provided adhesive contractual provisions which it was unwilling to negotiate, injected its own representatives into the day to day operations of the borrowers under the pretext of providing technical assistance, interfered with relationships between the borrowers and third parties in order to claim an entitlement to direct access to revenue, made misrepresentations concerning a desire to

assist the borrowers' enterprises grow and violated federal laws concerning day to day control of federally regulated assets such as radio and television broadcast licenses.

38. DBZ's lending strategy was actually a "loan to own" strategy calculated to deprive the borrowers and unsecured creditors of any equity in the collateral and to obtain title to the collateral at a depressed price only to later attempt to bundle the collateral with like kinds of assets and to sell or flip those bundled assets on the market at an enormous return for DBZ, a hedge fund.

39. In order to achieve their unlawful goals, defendants DBZ, Straight Way, McMurray and Bernard (the "Zwirn" defendants) engaged in a pattern of pursuing African American radio broadcast licensees and employing unscrupulous and predatory lending and collection practices.

40. As a result of the actions of the Zwirn defendants, roughly 20% of the radio broadcast licenses held by African Americans nationally have been impacted adversely. The Zwirn defendants lending and collection practices have not adversely impacted 20% of the non African American held radio broadcast licenses.  This disparate impact is violative of ECOA.

41. DBZ's actions were aided and abetted by all other defendants.

### VI.  FIRST CLAIM FOR RELIEF – Disparate Impact

42. Plaintiffs reallege that which has been stated in Paragraphs 1 through 41 above as though fully restated herein.

43. Plaintiffs are members of a class protected by the provisions of ECOA.

44. The lending and collection practices of the Zwirn defendants have had a disparate impact upon the members of the protected class, specifically African -Americans.

13

45. The lending and collection practices of the Zwirn defendants are the products of a deliberate and calculated strategy to exploit the unavailability of capital to African American broadcasters.

46. By reason of the Zwirn defendants' overt, racially motivated acts, Plaintiffs have suffered very substantial direct monetary losses.

47. As a further result of the practices of the Zwirn defendants, the number of African-American controlled radio licenses in the United States has been reduced by 20% with the resulting injury not only to Plaintiffs, but to the community at large. The practices of the Zwirn defendants have not had an impact of this magnitude on non-African-American radio broadcast licensees.

48. The Zwirn defendants are liable for compensatory and punitive damages, interest and attorneys fees.

## VII.  SECOND CLAIM FOR RELIEF – Inappropriate Collateral Sale

49. Plaintiffs reallege that which has been stated in Paragraphs 1 through 48 above as though fully restated herein.

50. As part of its oppressive and commercially unreasonable conduct, DBZ attempted to sell TBI's collateral. DBZ collateral sale tactics were designed to appear to publically dispose of collateral in accordance with the provisions of Article 9, when in reality DBZ intentionally attempted to dispose of the collateral in a commercially unreasonable fashion with DBZ as the only possible bidder due to insufficient publicity for the sale.

51. DBZ attempted to obtain TBI's collateral in the following manner: TBI and DBZ entered into an agreement involving the refinancing of the TBI radio stations. On January 24, 2008, counsel for DBZ issued the purported Notification of Public

Disposition Under Article 9 of the UCC that is attached at Exhibit 3 (the "Notification").
By reason of certain defects in the January 24, 2008 Notification, DBZ rescinded it and
issued a Second Notification on February 4, 2008, a copy of which is at Exhibit 4. (The
Second Notification).

52. The Second Notification states that DBZ intends to sell at a public sale all of the
physical assets of the broadcast stations that collateralize the refinancing agreement
between DBZ and TBI. The date of the proposed sale set forth in the Second Notification
was Tuesday, February 12, 2008. The sale was scheduled to occur in the offices of
DBZ's New York counsel, Vinson & Elkins.

53. Upon receipt of the Second Notification TBI requested its rescission for the
following reasons:

a. The Second Notification of Disposition of Collateral purports to advise TBI of a
public disposition of collateral. Contrary to the requirement under Article 9
however, the Notification does not set forth procedures that indicate that the
proposed sale will be conducted in a commercially reasonable manner.
Specifically, the Notification although denominated as a public sale, does not
indicate that any prospective purchaser other than the Secured Party has been
advised of the sale. There was no indication of advice to media brokers or of
publication in any news source calculated to reach the purchasing public. The
Notification did not provide for inspection of the collateral by a prospective
purchaser in advance of sale. The Notification did not address how the Secured
Party will obtain access to collateral not in its possession or located at places not
under the Secured Party's control without causing a breach of the peace. The

Notification is a mere pretext, that is to say, it contemplated a private sale, at which only the Secured Party was a purchaser, while purporting to be a sale open to the public;

b.  The Second Notification was violative of the Federal Communications Act of 1934 for the reason it contemplates the following:

    i)  Separation of a broadcast station's operating assets from its operating authorization as proscribed in <u>Kirk Merkley, Receiver, 94 FCC 2d 82 9(1987)</u> and <u>In re. Applications of Arecibo Radio Corporation 101 FCC 2d 545 (1985)</u>; and

    ii)  Premature assumption of control of the TBI radio authorizations by the Secured Party;

c.  TBI disputed that Section 2 of the Security Agreement or Section 2 of the Licensee Security Agreement empowered the Secured Party to dispose of the collateral in the manner outlined within the Notification; and

d.  By reason of the inequitable conduct of the Secured Party, TBI disputed that an actionable default of the financing agreement had occurred.

DBZ refused to rescind the Second Notification and stated it intended to proceed with the sale.

DBZ's attempted action violated numerous provisions of the UCC in that the Second Notification failed to propose a sale that was commercially reasonable.

Under Section 9-627 of the UCC a secured party must proceed in a commercially reasonable fashion. In determining whether conduct is commercially reasonable a court should consider the following:

16

(b) Dispositions that are commercially reasonable.  A disposition of collateral is made in a commercially reasonable manner if disposition is made:

(1) in the usual manner on any recognized market;
(2) at the price current in any recognized market at the time of the disposition; or
(3) otherwise in conformity with the reasonable commercial practice among dealers in the type of property that was the subject of the disposition.

UCC §9-627

54. The proposed disposition here was not commercially reasonable for the following reasons:

a)  The collateral is in Florida however, no publication of sale had been circulated in Florida;

b)  There was no provision for a potential purchaser to inspect the property;

c)  No sale procedures were established;

d)  No publication of sale was circulated in any media trade journals or other industry publications reasonably calculated to reach potential purchasers;

e)  There was no publication directed at the recognized radio markets;

f)  No media brokers were contacted to dispose of the collateral;

g)  The proposed sale was violative of federal law for the reason it sought to separate the physical assets of a radio station from its license and prematurely transfer control of the license without FCC approval.

55. Under the UCC when a secured party fails to proceed in a commercially reasonable manner a court may enjoin that party.  Specifically §9-625 states:

Section 9-625.  Remedies for Secured Party's Failure to Comply Article.

17

(a) Judicial orders concerning noncompliance.  If it is established that a secured party is not proceeding in accordance with this article a court may order or restrain collection, enforcement, or disposition collateral on appropriate terms and conditions.

(b) Damages for noncompliance.  Subject to subsections (c), (d), (f), a person is liable for damages in the amount of any loss cause a failure to comply with this article.  Loss caused by a failure to comply may include loss resulting from the debtor's inability to obtain or increased costs of, alternative financing.

56. By reason of DBZ's unlawful acts in attempting to sell collateral in violation of Article 9, Plaintiffs were damaged and DBZ is liable  in compensatory damages, interest and attorney's fees.

## VIII.  THIRD CLAIM FOR RELIEF –
### Violation of the Federal Communications Act

57. Plaintiffs reallege every allegation set forth in Paragraphs 1 through 56 above, as though fully restated herein.

58. Aside from the clear violations of the UCC set forth above, the Second Notification was also violative of federal law in that it contemplated the premature transfer of control of a FCC license, and proposed the transfer of a bare FCC license.

The FCC has stated:

Section 310(d) of the Communications Act, as amended, prohibits the transfer of control of a broadcast station license, or any rights thereunder, without prior Commission consent.  47 U.S.C. § 310(d).  *See also* 47 C.F.R. § 73.3540.

"The focus of any Commission inquiry with respect to the locus of control of a station's operation is tripartite:  the programming, the personnel and the finances."  *WGPR, Inc.*,  10FCC Rcd at 8141.  Licensees are permitted under Section 310(d) of the Act to delegate day-to-day operations, but such delegation may not by wholesale.  The licensee...must mandate the basic policies pertaining the fundamental station operations in these three areas.

> *See Southwest Texas Public  Broadcasting Council,* 85 FCC 2d
> 713, 715 (1981);  *The Alabama Educational Television
> Commission,*  33 FCC 2d 495, 508 (1972).  The Commission
> evaluates issues of license control by ascertaining whether the
> licensee established policies governing these three essential areas
> of station operation.  *See WGPR, Inc.* 10 FCC Rcd at 8142...
>
> In determining whether or not the licensee has control over station
> programming, the Commission has looked at, among other things,
> the licensee's involvement in any format changes, and the ability
> of the licensee to reject or preempt programming.   *Choctaw
> Broadcasting Corporation,* 12 FCC Rcd 8534, 8538-39 (1997);
> *WGPR, Inc.,*  10 FCC Rcd at 8142... Where a dispute is before a
> court, the licensee must retain actual control of essential station
> functions unless the Commission gives prior consent to the
> assignment or transfer of control of the station.  Thus, it is a
> violation of the Communications Act to invoke remedies for
> breach, including injunctive or other equitable relief, that impinge
> on such control, without obtaining prior Commission consent...In
> this regard, control over any of the three areas essential to a station
> operation is sufficient for finding of an unauthorized transfer of an
> unauthorized assumption of control. *See, e.g., Hicks Broadcasting
> of Indiana, LLC,* 13 FCC Rcd 10622, 10677 (1998)(Hearing
> Designation Order).

*See,* In the Matter of Citicaster DA 01-344, File No 00-1H-0283, NAL/Acct No.

200132080019/MG.  Here, by commandeering the physical assets of the radio properties

DBZ proposes to take.

59. The Second Notification also violated the FCC bare license policy.

> A bare license may not be assigned for a consideration... A
> broadcast license is not an "asset" of [a debtor's] estate which
> automatically passes to the [secured party].  Jurisdiction over the
> disposition of a license remains exclusively with the Commission.
> Edward B. Mulrooney, 13 RR 2d 1028 [1968].

60. The FCC has consistently held that a station's operating authorization must

accompany its physical assets. Merkley, *supra.*

Aside from violations of the Uniform Commercial Code, the conduct of DBZ

violated of the Federal Communications Act of 1934 in that it proposed to separate the

physical assets of a radio station from its license, attempted to take premature control of the license, and attempted to cause the transfer of an FCC license to an entity with more alien ownership than permitted by Federal law. Plaintiffs have been damaged by DBZ's ongoing attempts to violate the Communications Act and have filed a formal complaint with the FCC, FCC Enforcement Division, Case No. EB-08-IH-0692. By reason of defendants actions, defendants are liable for compensatory damages, interest and attorney fees.

## IX. FOURTH CLAIM FOR RELIEF –
### Aiding and Abetting Breach of Fiduciary Duty

61. The Plaintiffs reallege every allegation set forth Paragraphs 1 through 60 above, as though fully restated herein.

62. The Defendants conduct, as set forth above, was in breach of their fiduciary duties.

63. All Defendants knew that Straight Way, Bernard, BE/GS, Scott, Williams and McMurray were engaged in breaches of fiduciary duty and other misconduct.

64. All Defendants gave substantial assistance and encouragement to the breaches of fiduciary duty.

65. Accordingly, all Defendants are jointly and severally liable for the damages caused by the wrongful conduct of DBZ, Straight Way, Bernard, BE/GS, Scott, Williams and McMurray.

## X.  FIFTH CLAIM FOR RELIEF – Improvident Lending

66. Plaintiffs reallege every allegation set forth in Paragraphs 1 through 65 above as though fully restated herein.

67. DBZ knew that there was inadequacy of consideration and inability to repay in connection with the loans made to TBI.

68. DBZ owed a duty of care in lending to the TBI.

69. By reason of the foregoing, DBZ breached its duty of care and improvidently lent funds to TBI and others similarly situated.

## XI.  SIXTH CLAIM FOR RELIEF –
## Breach of the Covenants of Good Faith and Fair Dealing

70. Plaintiffs reallege every allegation set forth in Paragraphs 1 through 69 above, as though fully restated herein.

71. Every contract, including the loan agreements, contains an implied covenant of good faith and fair dealing.

72. By reason of the collection tactics and practices of DBZ,  DBZ obtained the use of the TBI's assets for ultra vires purposes and/or for the personal benefit of DBZ and its subsidiaries.

73. By reason of the foregoing, DBZ engaged in waste of corporate assets and ultra vires acts and caused damage to Plaintiffs and others similarly situated.

## XII.  SEVENTH CLAIM FOR RELIEF –
## Tortious Interference With Contractual Relations

74. Plaintiffs reallege every allegation set forth in Paragraphs 1 through 73 above, as though fully restated herein.

75. By reason of the foregoing, there were existing contractual rights and relationships between TBI and its unsecured creditors.

76. Defendants without justification or excuse, maliciously interfered with the existing contractual rights and relationships between TBI and their unsecured creditors, thereby causing damage to Plaintiffs.

## XIII.  EIGHTH CLAIM FOR RELIEF –
### Tortious Interference With Prospective Business Advantage

77. Plaintiffs reallege every allegation set forth in Paragraphs 1 through 76 above, as though fully restated herein.

78. By reason of the foregoing, there were reasonable expectations of prospective financial benefits existing between TBI and its unsecured creditors.

79. Defendants without justification or excuse, maliciously interfered with the prospective financial benefits between TBI and its unsecured creditors causing financial injury and damages to Plaintiffs.

80. Defendants are liable to Plaintiffs in compensatory and punitive damages, attorney fees, interest and costs.

## XIV.  NINTH CLAIM FOR RELIEF – Deceptive Practices

81. Plaintiffs reallege every allegation set forth in Paragraphs 1 through 80 above, as though fully restated herein.

82. Defendants acts as described above constitute a violation of various state, deceptive and unfair business practices acts and laws, to be described with more particularity following class certification and identification of class members.

83. Plaintiffs and Class members have been injured in their business and property by paying more for financing and losing their assets due to Defendants' violation of state deceptive and unfair business laws.

84. Plaintiffs and other Class Members are entitled to recover the damages they sustained, as permitted by the applicable state statutes, for the injuries caused by Defendants' violations of state statutes.

## XV. VIOLATION OF FLORIDA STATUTE §448.102(1)(3)

85. Plaintiff realleges every allegation set forth in Paragraphs 1 through 84 above as though fully stated herein.

86. Defendants retaliated against Plaintiff Glenn Cherry in violation of §448.102(1)(3) for filing a complaint with the FCC concerning DBZ's premature assumption of control of TBI's radio licenses.

87. Plaintiff Glenn Cherry has been damaged by reason of Defendants' violation of the Florida Act.

88. Defendants are liable for compensatory damages, punitive damages, attorneys fees, interest and cost.

## XVI. UNJUST ENRICHMENT

89. Plaintiff Group Assets realleges every allegation set forth above in Paragraphs 1 through 88 as though fully restated herein.

90. Group Assets owns or controls certain studio and transmitter sites in Florida and Georgia.

91. Defendants have, in violation of the relevant agreements, utilized these sites without paying rent.

92. Group Assets has been damaged by Defendants failure to any rent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the Class and Subclass demand judgment against defendants as follows:

A. That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certify the Class and Subclass represented by Plaintiffs, designating their attorney as Class and Subclass Counsel;

B. That the Court adjudge and decree that defendants, and each of them, engaged in a violation of Article 9 of the Uniform Commercial Code and of the Federal Communications Act;

C. That judgment be entered against defendants, jointly and severally in an amount not less than $250,000,000.00, in favor of Plaintiffs and the Subclass members under state consumer protection and deceptive and unfair business practices acts and laws for damages they sustained;

D. That treble damages be awarded by reason of defendants malice and premeditation;

E. That Defendant Group Assets recover an amount not less than $350,000 in rent from defendants; and

F. That Plaintiff recover the costs of suit, including reasonable attorneys and experts fees; and That the Court grant such other, further or different relief as may be just.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury by the maximum number allowable at law.

Trial Counsel:

Of Counsel:
Percy Squire, Esq. (0022010)
Percy Squire Co., LLC
514 S. High Street
Columbus, Ohio 43215
614-224-6528 Telephone
614-224-6529 Facsimile
psquire@ap-lawfirm.com

Charles W. Cherry II, Esq.
5200 SW 18 St.
Plantation, FL 33317
813-267-7342 Telephone
954-583-9667 Facsimile
Florida Bar #382221
ccherry2@aol.com

## EXHIBIT LIST

EXHIBIT 1A   September 30, 2008 response of Dr. Glenn Cherry to FCC request

EXHIBIT 1   March 31, 2003 Note

EXHIBIT 2   September 30, 2001 Note

EXHIBIT 3   January 24, 2008 Notification of Public Disposition

EXHIBIT 4   February 4, 2008 Notification of Public Disposition

25